# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KENNETH BLUE,<br><br>　　　　　Plaintiff,<br>　v.<br><br>CITY OF HARTFORD, KELLY KIRKLEY-BEY, individually and in her professional capacity, RJO WINCH, individually and in her professional capacity & THOMAS J. CLARKE II, individually and in his professional capacity,<br><br>　　　　　Defendants. | Civil Action No.<br>3:18-cv-00974 (CSH)<br><br><br>FEBRUARY 13, 2019 |

## OMNIBUS RULING ON DEFENDANTS' MOTIONS TO DISMISS

**HAIGHT, Senior District Judge:**

Plaintiff Kenneth Blue brings this action against the City of Hartford, Kelly Kirkley-Bey, Councilwoman rJo Winch, and Council President Thomas J. Clarke II. Defendants Kirkley-Bey, Winch, and Clarke are all sued in both their individual and professional capacities. *See* Doc. 1 ("Compl."). Plaintiff alleges that all Defendants engaged in Title VII violations, harassed and retaliated against him, and intentionally and negligently inflicted emotional distress upon him. Compl. ¶¶ 157–162, 163–171, 178–183, 184–188. He also asserts a negligence claim against only the City of Hartford. *Id.* ¶¶ 172–177. Pending before this Court are the Defendants' three motions to dismiss Plaintiff's Complaint: one from Kirkley-Bey, one from Winch, and one from the City of Hartford and Clarke. *See* Docs. 12, 17, 18. Plaintiff filed objections to all motions, [Docs. 20, 30, 31], and Defendant Winch filed a reply, [Doc. 33]. This Ruling resolves Defendants' motions.

# I. BACKGROUND

The facts herein are taken from the allegations in Plaintiff's Complaint, which are accepted as true only for the purposes of this Ruling.

Plaintiff is a gardener employed by the City of Hartford. Compl. ¶ 11. Plaintiff's work duties apparently encompass maintenance assignments such as setting up for special events. *Id.* ¶¶ 16, 28, 68. He also serves as President of the 1719 union.[1] *Id.* ¶ 11.

Plaintiff describes multiple occasions when Defendant Kirkley-Bey harassed him and, in one instance, sexually assaulted him. Kirkley-Bey is the executive assistant to Defendant rJo Winch, a councilwoman on the City of Hartford's Court of Common Council. *Id.* ¶¶ 2, 3. From February 2016 to November 2016, Kirkley-Bey directed negative comments at Plaintiff and other city maintenance employees about the cleanliness of City Hall. *Id.* ¶ 18. Her conduct eventually focused onto Plaintiff for refusing to share confidential information regarding union negotiations with the Mayor. *Id.* ¶ 21. For example, she told people waiting in line to donate at a City Hall toy drive event to make complaints about Plaintiff and the limited amount of toys that were donated. *Id.* ¶¶ 25–26.

On or about January 12, 2017, Plaintiff was in the City Hall parking lot when he saw Kirkley-Bey speed her car towards him, causing him to step aside onto a platform. *Id.* ¶¶ 27, 30, 31. When informed of the event, Defendant and then-Council President Clarke said that he had spoken with

---

[1] A local news article suggests that Plaintiff is president of AFSCME Local 1716, not 1719. Jamie Ratliff, *Hartford Union Rejects Contract Offer*, NBC Connecticut (May 20, 2017), https://www.nbcconnecticut.com/news/local/Union-Members-Reject-Contract-that-Would-Save-Hartford-Millions-423321534.html/. AFSCME is the American Federation of State, County & Municipal Employees. AFSCME, https://www.afscme.org/union/about (last visited Feb. 13, 2019).

Kirkley-Bey and Winch about "bullying" and that he would "speak to her again."[2] *Id.* ¶ 35. Plaintiff and Winch also sat down in Plaintiff's office to discuss the parking lot incident with police officer James Barrett that afternoon. *Id.* ¶¶ 39, 42. "Kirkley-Bey barged into the meeting and shouted that [Plaintiff] was a 'clown ass nigger.'" *Id.* ¶ 44. She continued yelling down the hallway while Officer Barrett escorted her away. *Id.* ¶ 47. Winch provided a statement, which contained lies and omissions, to Plaintiff's supervisor about what happened in the meeting. *Id.* ¶¶ 51–55.

On or about February 3, 2017, Plaintiff and Kirkley-Bey were present for a City Hall event when a security officer informed Plaintiff that Kirkley-Bey had a maintenance issue with her office door lock. *Id.* ¶¶ 67–70. Plaintiff and the security officer went to inspect the door when Kirkley-Bey pulled Plaintiff back by the arm to speak with him, and later, placed her hands on Plaintiff again when he was speaking with other employees. *Id.* ¶¶ 71–72, 75. At the end of the event, Plaintiff was in the maintenance office when Kirkley-Bey came in and hugged him. *Id.* ¶¶ 77–78. She then tried to place Plaintiff's hands on her breasts and genital area and to kiss Plaintiff on the mouth, asking him "[W]hat can I do to fix this[?]." *Id.* ¶¶ 80–81. She also smacked Plaintiff's behind several times as Plaintiff was leaving the office. *Id.* ¶ 85. Kirkley-Bey appeared to be intoxicated throughout the events of February 3, 2017. *Id.* ¶¶ 74, 79, 95. The security officer witnessed these events and reported them to Clarke and other city officials. *Id.* ¶¶ 90, 93.

The City of Hartford hired an outside firm to investigate Plaintiff's allegations regarding the events of January 12, 2017, and sexual assault on February 3, 2017. *Id.* ¶¶ 61, 97–99. Sent to

---

[2] Clarke was President of the Council at the time of Plaintiff's allegations, but he was replaced in January 2018. Jenna Carlesso, *Hartford Council Picks Glendownlyn Thames as New President in Wake of Sexual Harassment Scandal*, Hartford Courant (Jan. 8, 2018), https://www.courant.com/community/hartford/hc-news-hartford-council-president-election-2018 0108-story.html.

Clarke, the final report stated there was insufficient evidence to substantiate Plaintiff's claims regarding the January 12, 2017, parking lot incident, found Plaintiff's claims regarding the January 12, 2017, meeting and sexual assault on February 3, 2017, to have merit, and recommended remedial and/or disciplinary measures against both Plaintiff and Kirkley-Bey but that the action against Kirkley-Bey ought to be more severe than any such action against Plaintiff. Doc. 1-1 at 17–18, 22.

Plaintiff received a vague letter of reprimand from the interim director of the city's Department of Public Works on or about June 23, 2017. Compl. ¶ 113; Doc. 1-2 at 7. Plaintiff believes the letter was in retaliation for exposing Kirkley-Bey's behavior. Compl. ¶ 116.

Plaintiff's allegations became public in early December 2017, causing work to become "extremely hostile and uncomfortable for Plaintiff." *Id.* ¶¶ 117, 119–120. He also became anxious and depressed and went to the emergency room for vertigo and lightheadedness. *Id.* ¶¶ 121, 122. Winch, in particular, publicly attacked Plaintiff to discredit him. In a YouTube video discussing the incidents, Winch made allegedly false statements about Plaintiff. *Id.* ¶¶ 125–133. She also made two Facebook posts asserting that the outside firm's report, *see supra*, made no termination recommendations. *Id.* ¶¶ 139–141.

Kirkley-Bey remains a city employee. *Id.* ¶ 151. Plaintiff, however, has been denied employment opportunities in retaliation for reporting and effectively barred from working inside City Hall. *Id.* ¶¶ 154–155. Plaintiff accuses Kirkley-Bey and Winch of harassment, Winch and Clarke for aiding and abetting Kirkley-Bey's behavior by not terminating her, and the City of Hartford for turning a blind eye to the harassment. *Id.* ¶¶ 150–153.

## II. STANDARD OF REVIEW

"On a motion to dismiss, the issue is 'whether the claimant is entitled to offer evidence to support the claims.'" *Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1984)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard creates a "two-pronged approach," *Iqbal*, 556 U.S. at 679, based on "[t]wo working principles." *Id*. at 678.

First, all factual allegations in the complaint must be accepted as true and all reasonable inferences must be drawn in the favor of the non-moving party. *See id.; see also Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 591–92 (2d Cir. 2007) (citation omitted). The presumption of truth does not extend, however, to "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, "a complaint that states a plausible claim for relief" will survive a motion to dismiss and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (quotation marks omitted). "Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Associated Fin. Corp. v. Kleckner*, 480 F. App'x 89, 90 (2d Cir. 2012) (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

## III. DISCUSSION

### A. Defendant Kirkley-Bey's "Motion to Dismiss"

Defendant Kirkley-Bey filed a "Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 8." Doc. 12. However, the supporting memorandum is titled, "Memorandum i[n] Support of Motion for a More Definit[e] Statement." Doc. 12-1 ("K-B Mem."). At the end of the memorandum, Kirkley-Bey asks that Plaintiff's Complaint "be dismissed without prejudice to Plaintiff leaving another opportunity to submit a more coherent pleading." *Id.* at 3. The Court thus construes Kirkley-Bey's motion as a motion for a more definite statement, seeking relief in the form of a dismissal without prejudice.

Kirkley-Bey makes this motion "[p]ursuant to Rule 8 of the Federal Rules of Civil Procedure." *Id.* at 1. Rule 8 provides the general rules of pleading, such as requiring "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), but it does not form the basis for a motion for a more definite statement, which is governed by Rule 12(e). Under Rule 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). The motion "must point out the defects complained of and the details desired." *Id.*

Although Rule 12(e) motions "are generally not favored and should not be granted as a substitute for discovery, the granting of a motion for a more definite statement is within the discretion of the Court." *Ramey v. Morgan*, No. 3:17-CV-01086 (JAM), 2017 WL 5171846, at *2 (D. Conn. Nov. 7, 2017) (citing *Clayton v. City of Middletown*, 237 F.R.D. 538, 539 (D. Conn. 2006)). *See also Vaden v. Lantz*, 459 F. Supp. 2d 149, 151 (D. Conn. 2006). "For a more definite

statement to be warranted, the complaint must be so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Liberty Mut. Ins. Co. v. Howmet Casting & Servs., Inc.*, No. 3:17-CV-014908 (VAB), 2016 WL 5661999, at *3 (D. Conn. Sept. 29, 2016) (quoting *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 456 (E.D.N.Y. 2009) (internal quotation marks and citations omitted)). "The rule is designed to remedy unintelligible pleadings, not to correct for lack of detail." *Howmet*, 2016 WL 5661999, at *3 (quoting *Kuklachev*, 600 F. Supp. 2d at 456).

As Kirkley-Bey's supporting memorandum points out, the Complaint is not without errors. For example, Plaintiff wrote an incomplete sentence about the 2016 toy drive event. K-B Mem. at 1 (referencing Compl. ¶ 25). However, the Complaint is not so badly written to be "unintelligible." Using the previous example, if one goes on to read the paragraph following the incomplete sentence, that particular allegation about Kirkley-Bey can be understood in full: "Defendant Kirkley-Bey engaged people waiting in line to donate toys and requested that they make complaints about Plaintiff Blue and the limited amount of toys that were donated." Compl. ¶ 26. Kirkley-Bey identifies several other paragraphs as too "vague and/or ambiguous" for her to respond. K-B Mem. at 1. While many of these allegations are quite generalized, reading them within the context of the Complaint often clarifies the exact allegation at issue. As another example, Kirkley-Bey demands additional details about her "numerous negative comments and complaints about the Plaintiff" alleged in paragraph 18 of the Complaint. *Id.* Plaintiff then ascribes a specific quote to Kirkley-Bey that he presumably found to constitute a "negative comment" as referenced in paragraph 18. Compl. ¶ 19. Moreover, the Complaint lays out specific instances involving Kirkley-Bey that form the heart of Plaintiff's claims against her, such as the alleged sexual assault on February 3, 2017. *See id.* ¶¶

67–99. There is ample detail in the Complaint for Kirkley-Bey to answer.

The Court fails to see how she would suffer prejudice "if required to answer or otherwise defend against the [C]omplaint in its current form." *Howmet*, 2016 WL 5661999, at *3. Kirkley-Bey has not demonstrated that the Complaint is so defective as to require a more definite statement. Accordingly, her motion for a more definite statement under Rule 12(e) will be DENIED. However, Kirkley-Bey's motion may also be construed as a motion under Rule 12(b)(6) to dismiss the Complaint for failure to state a federal claim. For the reasons stated *infra*, that motion will be GRANTED.

**B.    Identification of Defendant Winch**

Defendant Winch moves to dismiss Plaintiff's Complaint in the entirety for a number of different reasons, the first being "failure to properly identify the defendant in the summons." Doc. 17-1 ("R.W. Mem.") at 3. Plaintiff identifies Winch as "Councilwoman rJo Winch" in the caption of his Complaint. Compl. at 1. Winch argues that because "rJo" is not her legal name, Plaintiff has not identified her, and so any allegations against her must be dismissed. R.W. Mem. at 3. "Without actually being identified in the summons it is impossible for the purported defendant to know that [s]he has been sued." *Id.* at 4.

Winch egregiously misconstrues the law here. Due process does require proper identification, but it does not mandate dismissal of a civil case when the defendant is identified albeit with minor errors. Winch's supporting cases all concern "John Doe" defendants, whose identities are unknown before the filing of a complaint. *See Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), *In re Murphy*, 482 F. App'x 624 (2d Cir. 2012). Winch's identity is known. She is a member of the City of Hartford's Court of Common Council. Compl. ¶ 2. No one is confused about whom Plaintiff

is accusing when he mentions "rJo Winch" in his Complaint.

The usage of Winch's public moniker, as opposed to her legal name, in these legal proceedings is akin to cases in which a defendant's name is misspelled. In fact, Rule 15(c) was added to the Federal Rules of Civil Procedure to allow "correction of a formal defect such as a misnomer or misidentification." *Maior v. Koletsos*, 823 F. Supp. 497, 498 (N.D. Ill. 1993). This rule allows for "relation back," allowing for an amendment changing the party or the naming of a party to relate back to the date of the original pleading if the party received notice and it knew that the action would have been brought against it "but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C). Relation back is not yet apropos in this case as Plaintiff has not filed a motion to amend the Complaint, despite numerous references to a proposed amended complaint. *See*, *e.g.,* Doc. 30 at 6 ("Such facts . . . will be more specifically alleged in the Plaintiff's proposed amended complaint."); Doc. 31 at 5 ("[T]he plaintiff can use [Winch's legal] name as part of the proposed amended complaint."). Nonetheless, this doctrine illustrates that dismissal of all counts is not the appropriate remedy for the "misidentification" here. The Court will not dismiss the claims against Winch on this basis. Should Plaintiff later desire to file an amended complaint, he should address Winch's identification issue then.

**C.     Title VII Claims**

Plaintiff's Complaint in federal court is based upon asserted federal question jurisdiction. Specifically, he "brings this lawsuit under Title VII of the Civil Rights Act of 1964 . . . to recover damages suffered as a result of the harassment, sexual harassment and retaliation that occurred as a consequence of the Plaintiff reporting said conduct." Compl. ¶ 5. Plaintiff attaches to one of his opposition filings the copy a release of jurisdiction from the U.S. Equal Employment Opportunity

Commission. Doc. 30-1. Plaintiff thus seems to have surmounted the administrative jurisdictional hurdles to bring his Title VII allegations into federal court, which appear to encompass status-based discrimination claims and retaliation claims.[3] However, Plaintiff has not sufficiently pleaded a violation of law with respect to either of these sets of Title VII claims.

1. **Status-Based Discrimination Claims**[4]

Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2018) (emphasis added). In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), the Supreme Court clarified the pleading standard for claims of racial discrimination in violation of Title VII. It held that "[t]he *McDonnell Douglas* framework —which requires the plaintiff to show (1) membership in a protected group, (2) qualification for the job in question, (3) an adverse employment action, and (4) circumstances supporting an inference of discrimination—is an evidentiary standard, not a pleading requirement." *Id.* at 506 (referencing evidentiary standard for prima facie case of racial discrimination as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Instead, an employment discrimination complaint "must

---

[3] Plaintiff confusingly lumps together all his Title VII claims into one count in his Complaint without clarifying the specific actions alleged to be Title VII violations or the type of Title VII violations alleged. Compl. ¶¶ 157–162. Accordingly, the Court follows Plaintiff's lead in one of his opposition memoranda to a motion to dismiss by separating Plaintiff's Title VII count into status-based discrimination claims and retaliation claims. *See* Doc. 30 at 5–8.

[4] In an opposition memorandum, Plaintiff refers to his status-based discrimination claims as "civil rights claims" and attempts to explain why his Complaint shows that Defendants can be held liable for violating 42 U.S.C. §§ 1981, 1983. Doc. 30 at 5–7. However, Title VII claims are distinct from Section 1981 and 1983 claims, and Plaintiff makes no mention of Section 1981 or 1983 in the Complaint. In consequence, the Court will not construe the Complaint as alleging any Section 1981 or 1983 claims.

contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Swierkiewicz*, 534 U.S. at 506 (quoting Fed. R. Civ. P. 8(a)(2)).

The Supreme Court's reasoning was in part dependent on the minimal pleading standard of "no set of facts" test in *Conley v. Gibson*, 355 U.S. 41 (1957). *See Swierkiewicz*, 534 U.S. at 512–14. However, the Supreme Court then established the *Twombly-Iqbal* standard calling for plaintiffs to state a "plausible" case for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 669–70 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562–63 (2007). That analysis generated some confusion about whether *Swierkiewicz* remained the standard for Title VII plaintiffs.

The Second Circuit squarely addressed that question in *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 85 (2d Cir. 2015), concluding that "Title VII thus requires a plaintiff asserting a discrimination claim to allege two elements: (1) the employer discriminated against him (2) because of his race, color, religion, sex, or national origin."

> As to the first element, an employer discriminates against a plaintiff by taking an adverse employment action against him. A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation. We have held that the assignment of a disproportionately heavy workload can constitute an adverse employment action.
>
> As to the second element, an action is because of a plaintiff's race, color, religion, sex, or national origin where it was a substantial or motivating factor contributing to the employer's decision to take the action. While the Supreme Court has held that a plaintiff alleging age discrimination under the Age Discrimination in Employment Act must allege that age was the "but-for" cause of the employer's adverse

> action, the "motivating factor" standard still applies to discrimination
> claims based on race, color, religion, sex, or national origin. Hence,
> a plaintiff in a Title VII case need not allege "but-for" causation.

*Vega*, 801 F.3d at 85–86 (citations and internal quotation marks omitted).

To satisfy the first element of having been subjected to adverse employment action by his *employer*, Plaintiff could potentially point to the letter of reprimand he received, having been denied employment opportunities, and being "effectively . . . barred from working inside City Hall." Compl. ¶¶ 113, 154, 155. Plaintiff is employed only by the City of Hartford. *Id.* ¶ 11. He appears to argue some sort of agency liability theory to hold Defendants Kirkley-Bey, Winch, and Clarke accountable for his alleged status-based discrimination claims, [Doc. 30 at 6–7], but he has not pleaded any facts to suggest that any of these individuals acted on behalf of Plaintiff's employer at any point during the events outlined in the Complaint.

In fact, Title VII disallows such a theory. "Title VII 'does not create liability in individual supervisors and co-workers who are not the plaintiff['s] actual employers.'" *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2015) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014)). Moreover, it is doubtful that the alleged actions would constitute adverse employment actions. *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (concluding that an action could be adverse employment action if the plaintiff shows that it "created a materially significant disadvantage to her working conditions"); *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) ("An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities."); *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) ("A material adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." (citation and internal quotation marks omitted)).

Even if the Court gives Plaintiff the benefit of the doubt on the adverse employment action question, more serious deficiencies arise when examining the second element required for a status-based discrimination claim. The chief issue is that Plaintiff has not alleged that these adverse employment actions, or any actions for that matter, were done because Plaintiff is a member of a protected class. Plaintiff has not specifically alleged the protected class in which he is claiming membership. Plaintiff's opposition memoranda suggest that he is asserting discrimination claims on the basis of his race, and so the Court will analyze Plaintiff's claims as if he is asserting his race as the Title VII protected class. *See* Docs. 30 at 6; 31 at 7. However, the Complaint does not state Plaintiff's race or ethnicity.[5] One of his memoranda argues Defendants discriminated against Plaintiff "because of his race as a[n] African-American person." Doc. 31 at 7. Another argues it was "because of his race as a Latin-American person." Doc. 30 at 6. Plaintiff may have both African American and Latin American heritage, but this information only adds to the confusion when examining his cited examples purportedly showing that his race was a factor. *See* Docs. 30 at 6 (referencing Compl. ¶¶ 19, 20, 44); 31 at 7 (same). The first example is Kirkley-Bey's question to a third party: "What happened to the black guy that cleans the building in the evening? Why do we have to have the Spanish guy here, why can't we get the Black guy back here?" Compl. ¶¶ 18–20. Assuming Plaintiff is of mixed heritage, it is unclear whether he is the "black guy" or the "Spanish guy." Kirkley-Bey is seemingly complimentary toward the "black guy" and does not prefer the "Spanish guy" for some unstated reason, so that the reader cannot comprehend Plaintiff's Complaint

---

[5] One of the Complaint exhibits, a local newspaper article, does state that Plaintiff is African-American. Doc. 1-2 at 11 ("[B]oth Blue and Kirkley-Bey are African American.").

without being told which race includes Plaintiff. The second example is of Kirkley-Bey calling Plaintiff a "clown ass nigger" during Plaintiff's meeting with Officer Barrett and Defendant Winch. *Id.* ¶ 39–44. The racial slur could perhaps be indicative, but not determinative, of a discriminatory motive.[6]

Quite apart from these considerations, Plaintiff's Title VII discrimination claim is deficient because the statements in question are all ascribable to Defendant Kirkley-Bey. The racial epithet, and Kirkley-Bey's other words, are not evidence of a discriminatory motive by Plaintiff's *employer*. Even if one slur alone is enough to raise the allegation of racial animus, Plaintiff does not allege that Kirkley-Bey had any influence over his employment relationship with the City of Hartford. There is nothing in the Complaint to suggest that Plaintiff's membership in a protected class based on his race was a factor, let alone a "substantial" or "motivating" factor, contributing to the City of Hartford's decisions to direct *any* employment actions, adverse or not, against Plaintiff. Any adverse employment action is wholly unrelated to any allegation of racial discrimination in the Complaint. Accordingly, Plaintiff has not pled a plausible claim for relief for his status-based discrimination claims under Title VII, and so such claims against all Defendants are DISMISSED.

### 2. Retaliation Claims

Title VII also makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made unlawful by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a) (2018). To meet the pleading

---

[6] That is particularly true since the Complaint suggests alternative motivations for Kirkley-Bey's behavior. She was upset about the cleanliness of City Hall, and that "Plaintiff Blue was unwilling to share [with her] confidential information regarding the ongoing union negotiations with the Mayor." Compl. ¶¶ 18, 21.

standard for a retaliation claim then, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90. *See also Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) ("At the pleading stage, 'the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of Title VII litigation'" (citation omitted)). Again, it must be the *employer* who discriminates or takes the adverse employment action. *See* 42 U.S.C. § 2000e-3(a) (2018); *Littlejohn*, 795 F.3d at 313 (dismissing Title VII against everyone but Plaintiff's employer). To violate Title VII, retaliation occurs because plaintiff "engaged in protected activity—complaining about or otherwise opposing discrimination." *Vega*, 801 F.3d at 91.

With respect to the first element, an adverse employment action in the context of a Title VII retaliation claim covers a wider range of conduct than in the context of a Title VII status-based discrimination claim. *Id.* at 90. It is "any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "Petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (citation and internal quotation marks omitted). The standard for evaluating the materiality of an action alleged to be adverse is objective, but "context matters." *Id.* "[A]n act that would be immaterial in some situations is material in others," and some minor acts may be substantial if considered in the aggregate. *Id.*

To satisfy the second element, a plaintiff must also plausibly plead a connection between the adverse employment action and his engagement in a Title VII-protected activity. *Vega*, 801 F.3d at

90. A plaintiff can plead this connection indirectly, by showing that the adverse employment action followed closely in time after the protected activity or that he experienced disparate treatment compared to other employees who engaged in similar conduct. *Id.*; *Hicks*, 593 F.3d at 170. Causation may also "be shown by direct evidence of retaliatory animus." *Duplan*, 888 F.3d at 625. Moreover, retaliation must have been a "but-for" cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Vega*, 801 F.3d at 90–91. "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Id.* (citing *Nasser*, 133 S. Ct. at 2533).

Under the broader umbrella of adverse employment actions for a Title VII retaliation claim, Plaintiff meets the pleading standard for the first element. Again, he can point to the letter of reprimand he received, having been denied employment opportunities, and being "effectively . . . barred from working inside City Hall" as indications that his employer, the City of Hartford, took adverse action against him. *See* Compl. ¶¶ 113, 154, 155. Actions by others that Plaintiff deems retaliatory are, yet again, irrelevant under Title VII because only the City of Hartford is his employer, and Title VII ascribes liability only to Plaintiff's employer. Assuming that these three actions are enough to constitute actions that would dissuade an employee from speaking out about discrimination though, *see Vega*, 801 F.3d at 91, the Court must also determine that they were in response to Plaintiff engaging in protected activity, which would include complaining about discrimination or pursuing more formal processes. *See id.* Although nowhere in Plaintiff's pleadings does he mention having complained *about discrimination*, Plaintiff undoubtedly engaged in

protected activity by filing claims with the U.S. Equal Employment Opportunities Commission (EEOC) and the Connecticut Commission on Human Rights and Opportunities (CHRO). 42 U.S.C. § 2000e-3(a) (2018); Compl. ¶ 8. Thus, the Complaint establishes that there was adverse employment action and protected activity.

The Complaint, however, does not plead a "but-for" causation between the two. In fact, it does not allege any sort of causal relationship. Plaintiff does not allege direct racial animus by the City of Hartford, and so the Court must look for any showings or inferences of an indirect connection. There appears to be none. Plaintiff makes no mention of a comparison case, which would help show that the City of Hartford treated him differently because he filed EEOC or CHRO complaints. Nor does he provide key dates to support an inference of temporal causation. While the letter of reprimand is dated June 23, 2017, [Doc. 1-2 at 7], it is unknown when he was denied advancement opportunities, or when he was not allowed to work inside City Hall. As for the EEOC and CHRO releases of jurisdiction, they include the date of each release but not significant information such as when the EEOC and CHRO complaints were first made or were known to the Defendants. Docs. 1-2 at 23; 30-1. In fact, the Complaint does not even allege that Defendants knew Plaintiff filed EEOC and CHRO complaints. Without even a rough sequence of events surrounding Plaintiff's EEOC and CHRO complaint processes, the Court cannot infer an indirect causal relationship between the alleged retaliation and protected activity. The facts as pleaded do not show that Plaintiff suffered an adverse employment action as retaliation for filing these complaints. Accordingly, Plaintiff's Title VII retaliation allegations against all Defendants are insufficient to survive at this stage and are DISMISSED.

**D.     Supplemental Jurisdiction**

After dismissing Plaintiff's Title VII claims, the Complaint contains no other federal claims. Consequently, there is no longer federal question jurisdiction. Because Plaintiff's state claims are predicated upon supplemental jurisdiction, the Court must decide if it should continue to exercise supplemental jurisdiction in light of having dismissed Plaintiff's federal claims.

The general rule regarding supplemental jurisdiction is that "if the federal claims are dismissed before trial, even thought not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also* 28 U.S.C. § 1367(c)(4) (2012) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) [i.e., a state law claim] if the district court has dismissed all claims over which it has original jurisdiction."). This power to decline supplemental jurisdiction is permissive, not mandatory. *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305–06 (2d Cir. 2003) (comparing cases where the Second Circuit affirmed or denied district courts' exercise of supplemental jurisdiction over state law claims after federal claims were dismissed). Where the Second Circuit has upheld district courts' decisions to retain supplemental jurisdiction, federal law is implicated or the case has reached an advanced stage of litigation. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1191–92 (2d Cir. 1996) (finding no abuse of discretion in exercise of supplemental jurisdiction where federal claim dismissed days before scheduled start of trial); *Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1055 (2d Cir. 1990) (affirming exercise of supplemental jurisdiction where discovery completed, three dispositive motions decided, and state law claims concerned settled principles); *Baylis v. Marriot Corp.*, 843 F.2d 658, 665 (2d Cir. 1988) ("One factor that may sometimes favor retaining pendent jurisdiction is when a state claim is closely

tied to questions of federal policy and where the federal doctrine of preemption may be implicated.").

However, the Second Circuit generally disfavors exercising such jurisdiction. *Valencia ex rel. Franco*, 316 F.3d at 306 (citing *Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001); *Oliveira v. Frito-Lay, Inc.*, 251 F.3d 56, 64 (2d Cir. 2001); *Seabrook v. Jacobson*, 153 F.3d 70, 71–73 (2d Cir. 1998); *Fay v. South Colonie Central School District*, 802 F.2d 21, 34 (2d Cir. 1986)), *overruled on other grounds by Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002). There are good reasons to do so. The Supreme Court has counseled that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Even when neither party asks the Court to exercise supplemental jurisdiction, the default rule is that state law claims should be dismissed if all federal claims are dismissed. *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405–06 (2d Cir. 2017) (Calabresi, J., concurring) ("A district court judge would be well-advised, if the propriety of exercising supplemental jurisdiction is noticed early enough in a case, to say, 'I decline to decide the state-law issues, however simple they may be.'").

Litigation remains at an early, uncomplicated stage here. Defendants have not yet filed answers to the Complaint. No federal law is implicated in the remaining claims. Having dismissed the federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state claims. Accordingly, the state claims are dismissed as well.

## IV. CONCLUSION

For the foregoing reasons, Defendant Kirkley-Bey's Motion to Dismiss [Doc. 12] is DENIED under Rule 12(e) but is GRANTED under Rule 12(b)(6). Plaintiff's federal claims as to all

Defendants are DISMISSED WITH PREJUDICE. Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE to filing in a state court of competent jurisdiction.

As a result, there are no pending claims in this action, and the Clerk is directed to close this case.

It is SO ORDERED.

Dated: New Haven, Connecticut
       February 13, 2019

>*/s/ Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge